

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| IN RE:<br><br>MCDONALD, MARK LEE and<br>MCDONALD, KATHLEEN,<br><br>                      Debtors.<br><br>TULSA SPINE HOSPITAL, L.L.C.,<br><br>                      Plaintiff,<br>v.<br><br>MARK LEE MCDONALD and<br>KATHLEEN MCDONALD,<br><br>                  Defendants. | Case No. 05-30016-R<br>Chapter 7<br><br><br><br><br><br>Adv. No. 06-01027-R |

## MEMORANDUM OPINION

This adversary proceeding came before the Court for trial on the merits on May 23, 2006, on the Complaint filed by Plaintiff Tulsa Spine Hospital, L.L.C. (the "Hospital") on January 7, 2006 (the "Complaint"). In its Complaint, the Hospital seeks a determination that a debt owed to the Hospital by Defendants Mark and Kathleen McDonald (the "McDonalds") is not dischargeable pursuant to Sections 523(a)(4) and (a)(6) of the Bankruptcy Code. The parties entered into stipulations of fact as reflected in the Pretrial Order entered on May 23, 2006 (the "Pretrial Order"). The McDonalds appeared in person and through their counsel, Bruce G. Straub. The Hospital appeared through its counsel, Jay C. Baker. The parties presented testimony through four witnesses: Julie Frye, Rhonda Bowen, and Mark and Kathleen McDonald. After considering the testimony presented, the exhibits admitted into

evidence, the facts stipulated to by the parties in the Pretrial Order, the arguments of counsel, and the relevant legal authorities, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

**Jurisdiction**

The Court has jurisdiction of this "core" proceeding by virtue of 28 U.S.C. §§ 1334(b), 157(a), 157(b)(2)(I) and Local Civil Rule 84.1(a) of the United States District Court for the Northern District of Oklahoma.

**Contentions of the Parties**

The Hospital contends that the McDonalds, while acting in a fiduciary capacity, misappropriated and converted a check in the amount of $6,837.12 issued to the McDonalds by their insurance company for medical services rendered to Kathleen McDonald ("Kathleen") by the Hospital. In addition, the Hospital asserts that the McDonalds intentionally and maliciously injured the Hospital when the McDonalds cashed the insurance check and failed to forward the proceeds to the Hospital. The Hospital contends that the McDonalds' debt to the Hospital in the amount of $6,837.12 should be excepted from the McDonalds' discharge under Sections 523(a)(4) and (a)(6) of the Bankruptcy Code. The McDonalds assert that they are not fiduciaries within the context of Section 523(a)(4) and they deny that they had the intent necessary to support a claim under Section 523(a)(6).

**Findings of Fact**

On January 5, 2004, the McDonalds filed a personal injury action in the District Court of Tulsa County, Oklahoma, against Walden Special Partners, Ltd., d/b/a Avondale

Apartments ("Avondale") in a case styled <u>Kathleen and Mark McDonald v. Walden Special Partners, Ltd., d/b/a Avondale Apartments</u>, Case No. CJ-2004-7 (the "personal injury action").  In the personal injury action, the McDonalds alleged that Kathleen sustained injuries when she tripped and fell on Avondale's property on January 1, 2002. On March 28, 2006, the McDonalds dismissed the lawsuit because they did not have the financial resources to pursue the litigation.

On January 16, 2004, Kathleen was admitted to the Hospital for spinal surgery to treat the injury that she sustained as a result of her "slip and fall" on Avondale's property. Upon admission, Kathleen completed and signed a "FaceSheet" that required basic patient information, insurance information, and a description of the type of injury sustained by the patient.  Although the FaceSheet indicates that Kathleen represented that her injury was not the result of an accident, Kathleen testified that she was instructed to leave that particular section of the FaceSheet blank and did not "check the box" indicating that her injury was not an "injury due to an accident."[1]  <u>See</u> Pltf. Exh. 6 at 2.  Kathleen also executed an Admission Agreement which provided in pertinent part –

> Assignment of Benefits.  I hereby authorize and assign payment to the Tulsa Spine Hospital of any type of reimbursement or any payment from Medicare or State Medicaid Programs, or other third party payors, for any

---

[1] Although the Hospital controverts Kathleen's testimony, the Hospital did not allege nor is there any evidence that Kathleen's representation regarding the cause of her injury was made with the intent to injure the hospital.  In any event, sometime after Kathleen was admitted to the Hospital, the Hospital learned that Kathleen's injury was the result of an accident and that the McDonalds had a pending personal injury action against Avondale.

>and all costs of my medical care provided by the Hospital or by its agents, designees, or independent medical contractors.

Pltf. Exh. 1.  At the time of her admission, Kathleen was insured under a policy of medical insurance through Mark McDonald's employer issued by Blue Cross/Blue Shield of Oklahoma ("Blue Cross").  Because the Hospital was not a Blue Cross provider, Blue Cross did not recognize the assignment of benefits set forth in the Admission Agreement and prohibited direct payment of insurance benefits to the Hospital.  Thus, the Hospital required Kathleen to execute an assignment of insurance benefits which provided --

>Blue Cross Blue Shield Insurance Company prohibits direct payment to the hospital; therefore payment will be mailed directly to the patient.  I, as the patient of Tulsa Spine Hospital agree to forward any payments made to me by Blue Cross Blue Shield to the hospital along with a copy of the explanation of benefits for the professional or medical expense benefits allowable, and otherwise payable to me under my current insurance policy as payment toward the total charges for the professional services rendered. **THIS IS A DIRECT ASSIGNMENT OF MY RIGHTS AND BENEFITS UNDER THIS POLICY**.  This payment will not exceed my indebtedness to the above mentioned assignee, and I have agreed to pay, in the current manner, any balance of said professional service charges over and above this insurance payment.  Failure to forward any insurance payments that I receive will revert my claim back to full face value, which will be my responsibility.

Pltf. Exh. 2 (the "Assignment").  Although the Assignment provided that Kathleen would be liable for "any balance of said professional service charges over and above [the] insurance payment[,]" the Hospital advised Kathleen at the time of her admission that if she forwarded all insurance proceeds that she received from Blue Cross to the Hospital in accordance with the Assignment, then the Hospital would accept such proceeds as payment in full for all

services rendered to Kathleen by the Hospital.[2] If the McDonalds failed to forward all insurance proceeds to the Hospital, then the McDonalds would be liable for the total charges for services provided by the Hospital.

On January 19, 2004, Kathleen was discharged from the Hospital. The invoice for all medical services provided to Kathleen totaled $11,491.41. See Pltf. Exh. 3. At the time of Kathleen's discharge, the McDonalds were not required to submit payment to the Hospital. The Hospital agreed to submit the insurance claim to Blue Cross on behalf of the McDonalds.

On Saturday, June 5, 2004, the McDonalds received a check in the amount of $6,837.72 from Blue Cross as reimbursement for the medical services provided to Kathleen by the Hospital (the "Blue Cross check").[3] On Monday, June 7, 2004, Kathleen and her sister went to the Hospital for the purpose of tendering the Blue Cross check to the Hospital in accordance with the Assignment. The Hospital refused to accept the Blue Cross check unless the McDonalds immediately paid the remaining balance of the charges. Kathleen explained

---

[2] Under Oklahoma law, a written agreement can be modified only by another written agreement. See 15 O.S. § 237; Nordam v. Burbank Aeronautical Corp., 65 F.3d 178 (Table), 1995 WL 511141, *2 (10th Cir. 1995). "An oral agreement modifying a written contract, although established, is ineffective to alter the terms of the written contract until its terms have been fully executed." Dewberry v. Universal C.I.T. Credit Corp., 1966 OK 77, 415 P.2d 978, 979. The Court's determination of whether the McDonalds' debt is excepted from discharge is not dependent upon the enforceability of the oral agreement.

[3] In the Pretrial Order, the parties stipulated that the Blue Cross check was in the amount of $6,837.12. See Pretrial Order at 2. However, Plaintiff's Exhibit 5, a copy of the Blue Cross check, establishes that the amount of the check was actually $6,837.72.

5

that she was not in a position to immediately pay the balance of the debt and suggested that the Hospital establish a payment plan for the balance of the debt. The Hospital was not willing to establish a payment plan for the McDonalds. After refusing to accept the Blue Cross check, the Hospital requested that Kathleen provide specific information about her pending personal injury action, including the name of the defendant, its insurance carrier, the claim adjuster, and the claim reference number. Kathleen assumed that the Hospital intended to recover the full amount of its debt from the McDonalds' personal injury action. Later that same day, the McDonalds deposited the Blue Cross check into their checking account. The McDonalds did not forward any of the proceeds of the Blue Cross check to the Hospital and expended such proceeds on various bills and living expenses.

In a letter dated June 9, 2004, Kathleen provided the Hospital with the information about her personal injury action that the Hospital had requested:

> Ms. Fry [sic]
> Here is the information that you requested from me on Monday when we were there in your office. I had already given this same information to your office back in January.
> \* \* \*
> Cambridge Integrated Services Group
> 10500 Heritage, Suite 265
> San Antonio, TX 78216
>
> Claim # 27723717
> Adjuster Robert Faison
> Ph. 1-866-743-6418 ext. 1319
> or Houston office 713-296-5924

Def. Exh. 3. The Hospital denied that it ever received the letter.

6

On October 13, 2004, Kathleen forwarded a second letter to the Hospital and/or Jay Baker, counsel for the Hospital, which was marked as "received" by the Hospital on October 19, 2004. In the letter, Kathleen explained that she had a pending personal injury lawsuit and that the Hospital's claim would be paid. See Pltf. Exh. 4; Def. Exh. 9.

On November 19, 2004, the Hospital filed a Hospital Lien against Kathleen McDonald, Avondale Apartments and Cambridge Integrated Services Insurance, Avondale's insurance company, for the sum of $11,481.41 in connection with the McDonalds' personal injury action (the "Hospital Lien").[4] The Hospital Lien provided that the Hospital "has a claim and lien against the above described patient and insurance company for all proceeds payable thereunder up to the amount of the claim herein above stated[.]" Def. Exh. 8.

On November 19, 2004, the Hospital also filed a breach of contract action against the McDonalds in the District Court of Tulsa County, Oklahoma, styled Tulsa Spine Hospital LLC v. Kathleen McDonald and Mark L. McDonald, Case No. CJ-2004-7211. On April 25, 2005, the District court entered a judgment in favor of the Hospital and against the McDonalds in the amount of $11,491.41 plus attorney's fees in the amount of $1,000.00.

On November 12, 2005, the McDonalds filed a chapter 7 bankruptcy petition. The McDonalds listed the Hospital as an unsecured nonpriority creditor in the amount of $11,491.41. On January 7, 2006, the Hospital filed the instant Complaint against the

---

[4] On February 11, 2005, the Hospital amended the Hospital Lien to correct an error in the lien claimant's name. The amount of $11,481.41 set forth in the Hospital Lien (and the amended Hospital Lien) differs from the amount of $11,491.41 set forth in the Hospital's invoice. See Pltf. Exh. 3; Def. Exhs. 7 and 8.

7

McDonalds to determine the dischargeability of the McDonalds' debt to the Hospital under Sections 523(a)(4) and (a)(6) of the Bankruptcy Code. The parties stipulated that the Hospital is objecting to the McDonalds' debt to the Hospital in the amount of $6,837.12.

**Burden of Proof**

A creditor seeking to except a debt from discharge under Section 523 must prove each element of its claim by a preponderance of the evidence. See Grogan v. Garner, 498 U.S. 279, 291 (1991). Exceptions to discharge are narrowly construed, and any doubts must be resolved in favor of the debtor. See Bellco First Fed. Credit Union v. Kaspar (In re Kaspar), 125 F.3d 1358, 1361 (10th Cir. 1997)(citation omitted).

**Conclusions of Law**

    **Section 523(a)(4)**

Section 523(a)(4) provides:

> (a)  A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt –
> 
>                     \*   \*   \*
> 
> (4)     for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny[.]

Section 523(a)(4) sets forth three separate legal theories that may be utilized to determine whether a debt is nondischargeable: (1) a claim for fraud or defalcation while acting in a fiduciary capacity, (2) embezzlement, and (3) larceny. See Bank Calumet v. Whiters (In re Whiters), 337 B.R. 326, 330 (Bankr. D. Ind. 2006); Bryant v. Lynch (In re Lynch), 315 B.R. 173, 175 (Bankr. D. Colo. 2004). The Hospital seeks a determination that the McDonalds' debt to it in the amount of $6,837.12 is nondischargeable for fraud or defalcation while acting

8

in a fiduciary capacity.[5] In order for a debt to be excepted from discharge for fraud or defalcation while acting in a fiduciary capacity, the creditor must establish: (1) the existence of a fiduciary relationship between the debtor and the objecting party, and (2) a defalcation committed by the debtor in the course of that fiduciary relationship. See Watson v. Parker (In re Parker), 264 B.R. 685, 700 (B.A.P. 10th Cir. 2001)(citations omitted).[6] In addition, the fiduciary relationship must be shown to exist prior to the creation of the debt in controversy. See Fowler Bros. v. Young (In re Young), 91 F.3d 1367, 1372 (10th Cir. 1996).

The existence of a fiduciary relationship under Section 523(a)(4) is determined under federal law, however, state law is relevant to the determination of whether a trust relationship exists. See id. at 1371 (citations omitted); see also *infra* notes 9-10. "Under this circuit's federal bankruptcy law, to find that a fiduciary relationship existed under § 523(a)(4), the court must find that the money or property on which the debt at issue was based was entrusted to the debtor." Id. (citations omitted). Thus, "an express or technical trust must be present for a fiduciary relationship to exist under Section 523(a)(4)." Id.; Davis v. Aetna Acceptance Co., 293 U.S. 328, 333 (1934).[7] "Neither a general fiduciary duty of confidence,

---

[5] The Hospital did not seek a determination of dischargeability of a debt for embezzlement or larceny under Section 523(a)(4). See Pretrial Order.

[6] Defalcation under § 523(a)(4) is a "fiduciary-debtor's failure to account for funds that have been entrusted to it due to any breach of a fiduciary duty, whether intentional, willful, reckless, or negligent." Antlers Roof-Truss & Builders Supply v. Storie (In re Storie), 216 B.R. 283, 288 (B.A.P. 10th Cir. 1997). The fiduciary is charged with knowledge of the law and its duties. No mental culpability need be shown. Id. at 289.

[7] With respect to Section 523(a)(4), a fiduciary relationship is limited to instances
(continued...)

9

trust, loyalty, and good faith, nor an inequality between the parties' knowledge or bargaining power, is sufficient to establish a fiduciary relationship for purposes of dischargeability." Holaday v. Seay (In re Seay), 215 B.R. 780, 786 (B.A.P. 10th Cir. 1997), *quoting* Young, 91 F.3d at 1371-72.[8]

An express trust must be based upon a "written document or technical trust instrument which expressly states that one is to hold specific property as trustee for the other." Tway v. Tway (In re Tway), 161 B.R. 274, 279 (Bankr. W.D. Okla. 1993). The elements necessary to establish the existence of an express trust include: (1) sufficient words to create a trust; (2) a clearly defined trust, res; and (3) an intent to create a trust relationship. See id. at 280. A court may also examine state law to determine if a trust arose out of a statute.[9] Id. at 279 (citation omitted). "To show a fiduciary capacity arising from a statutorily imposed trust for purposes of § 523(a)(4), a creditor must point to an express legislative design to create a trust relationship." Id. (citations omitted).[10]

---

[7](...continued)
involving express or technical trusts, and is thus more narrowly defined than it is under common law.

[8] For purposes of Section 523(a)(4), a fiduciary capacity "applies only to technical trusts, and not those that the law implies at contract." Id. (citation omitted).

[9] "Trusts imposed by state statutes are often, but by no means always, found to satisfy § 523(a)(4)." Employers Workers' Compensation Ass'n v. Kelley (In re Kelley), 215 B.R. 468, 473 (B.A.P. 10th Cir. 1997).

[10] To satisfy the requirements of § 523(a)(4), a fiduciary duty imposed by state statute must satisfy three requirements: (1) the trust res must be defined by the statute; (2) the statute must spell out the fiduciary duty; and (3) the statute must impose a trust on funds prior
(continued...)

The Hospital alleges that the Assignment executed by Kathleen created a fiduciary relationship between the parties. Language in a hospital admission form whereby a patient assigns to the hospital any insurance proceeds that the patient receives is not sufficient to create a fiduciary relationship between the parties. See University Orthopaedic Assocs. v. Catalano (In re Catalano), 98 B.R. 168, 170 (Bankr. W.D.N.Y. 1989)(finding that a fiduciary relationship did not exist between debtors and medical associates who provided medical care to debtors' son merely because debtors signed a patient admission agreement which assigned to hospital all medical benefits payable by third-party insurance carrier where there was no evidence of express trust and concluding that debtors' failure to remit insurance proceeds to associates did not render debt to associates nondischargeable under Section 523(a)(4)).

The Hospital failed to explain how a trust in its favor could arise from the Assignment nor did the Hospital provide any authority to support its contention. There is no written document or technical trust instrument which expressly states that the McDonalds are to hold specific property as trustee for the Hospital. The language in the Assignment is insufficient to create a trust. The Hospital offered no evidence of any express or technical trust, in existence prior to the alleged default, from which a fiduciary duty cognizable under the Bankruptcy Code might have arisen. Nor did the Hospital allege that a fiduciary relationship arose out of any statute. The Hospital failed to meet its burden of showing the existence of a fiduciary relationship required under Section 523(a)(4). Because this element has not been

---

[10](...continued)
to the act creating the debt. Id. (citation omitted).

11

proven, the Court need not address whether fraud or defalcation was committed. Accordingly, the McDonalds' debt to the Hospital is not excepted from discharge under Section 523(a)(4) of the Bankruptcy Code.

**Section 523(a)(6)**

Section 523(a)(6) provides:

(a)  A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt –

\* \* \*
(6)   for willful and malicious injury by the debtor to another entity or to the property of another entity[.]

11 U.S.C. § 523(a)(6).  The Supreme Court has determined the scope of the "willful and malicious injury" exception.  See Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998).  The Supreme Court stated that "[t]he word 'willful' in [Section 523] (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." Id. at 61 (emphasis in original).  In order for an action to be considered "willful" for purposes of Section 523(a)(6), the action must be intentional and the debtor must intend to injure another or the interests of another.  In Geiger, the Supreme Court's description of "situations in which an act is intentional, but injury is unintended, *i.e.*, neither desired nor in fact anticipated by the debtor" as beyond the scope of Section 523(a)(6) implies the converse – that injury is intended when it is either

desired or anticipated by the debtor. Geiger, 523 U.S. at 62.[11] This description is consistent with Section 8A of the Restatement (Second) of Torts which defines "intent" to mean that "the actor desires to cause [the] consequences of his act, or that he believes that the consequences are substantially certain to result from it." RESTATEMENT (SECOND) OF TORTS § 8A (1965). Thus, the willful injury requirement may be satisfied by showing that the debtor desired the consequences of his act or knew or believed that injury to the creditor, although not desired, was substantially certain to result from his actions. See Via Christi Reg'l Med. Ctr. v. Budig (In re Budig), 240 B.R. 397, 401 (Bankr. D. Kan. 1999) (finding the substantial certainty standard consistent with the requirement in Geiger that a debtor intend his act).[12] A willful injury may be established by direct evidence of a specific intent to harm a creditor. Mitsubishi Motors Credit of America, Inc. v. Longley (In re Longley), 235 B.R. 651, 657 (B.A.P. 10th Cir. 1999). "Willful injury may also be established indirectly by evidence of both the debtor's knowledge of the creditor's . . . rights and the debtor's

---

[11] Without equating intentional torts with acts covered by § 523(a)(6), the Court noted that § 523(a)(6)'s specification of "willful and malicious injury" "triggers in the lawyer's mind the category of 'intentional torts,' . . . . Intentional torts generally require that the actor intend 'the *consequences* of an act,' not simply 'the act itself.'" Geiger, 523 U.S. at 61-62, *quoting* RESTATEMENT (SECOND) OF TORTS § 8A, COMMENT *A* (1964) (emphasis in original).

[12] Cited with approval in Via Christi Reg'l Med. Ctr. v. Englehart (In re Englehart), 229 F.3d 1163 (Table), 2000 WL 1275614, at *3 (10th Cir. 2000) (unpublished opinion) (approving subjective formulation of the substantial certainty test in Budig and Mitsubishi Motors Credit of America, Inc. v. Longley (In re Longley), 235 B.R. 651 (B.A.P. 10th Cir. 1999) and stating that "the 'willful and malicious injury' exception to dischargeability in § 523(a)(6) turns on the state of mind of the debtor, who must have wished to cause injury or at least believed it was substantially certain to occur.").

knowledge that the conduct will cause particularized injury.  Id., *citing* Pasek, 983 F.2d at 1527 (other citation omitted).

Although Geiger defined "willful," it did not define "malicious."  Reference is therefor made to Tenth Circuit law to define "malicious."  In Dorr, Bentley & Pecha, CPA's, P.C. v. Pasek (In re Pasek), 983 F.2d 1524 (10th Cir. 1993), the Tenth Circuit recognized "willful" and "malicious" as separate elements, but blended their definitions so as to intertwine the meaning of either term.  Pasek stated, "[w]e believe the rule fully supported by our cases is that 'willful and malicious injury' occurs when the debtor, without justification or excuse, and with full knowledge of the specific consequences of his conduct, acts notwithstanding, knowing full well that his conduct will cause particularized injury."  Pasek, 983 F.2d at 1527.  While Geiger clarifies the definition of willful, it is evident that Pasek sets forth the malicious prong by integrating "without justification or excuse," into the elements of a Section 523(a)(6) action as set forth in Geiger.

Accordingly, in order to exclude a debt from discharge under the "willful and malicious" standard of § 523(a)(6), the Hospital was required to establish by a preponderance of the evidence that: (1) the McDonalds committed a wrongful and intentional act; (2) the act necessarily caused injury to the Hospital; (3) the act was without just cause or excuse; and (4) the McDonalds acted with the specific intent to cause injury.  See Geiger, 523 U.S. at 61-64.

Even if, as the Hospital alleges, the McDonalds committed a wrongful and intentional act when they cashed the Blue Cross check and failed to forward the proceeds to the Hospital, and even if such act injured the Hospital, the Hospital failed to establish that the McDonalds' action was without just cause or excuse or that the McDonalds acted with the specific intent to cause injury. Consistent with the standard under Geiger, the McDonalds' intentional act of cashing the Blue Cross check and spending the proceeds is insufficient to satisfy the willfulness element of Section 523(a)(6).

After the McDonalds received the Blue Cross check, Kathleen attempted to tender the check to the Hospital. The Hospital refused to accept the check and demanded that Kathleen tender the full amount of $11,491.41. When Kathleen suggested that the Hospital establish a payment plan for the remaining amount due, the Hospital refused. The Hospital may have concluded that if it accepted the Blue Cross check, such amount would constitute payment in full and the Hospital would be precluded from seeking the amount owed over and above the $6,837.72.[13] Because Kathleen attempted to deliver the Blue Cross check to the Hospital in accordance with the Assignment and the Hospital refused to accept the check, the McDonalds did not act without just cause or excuse nor did they intend to injure the Hospital when they cashed the Blue Cross check and spent the proceeds. In fact, the McDonalds believed that the Hospital ultimately would recover the full amount of its claim from the

---

[13] The Hospital acknowledged that it advised Kathleen at the time of her admission that delivery of the Blue Cross check would constitute payment in full of the McDonalds' debt.

15

personal injury action.[14]  The Hospital failed to meet its burden to establish that the McDonalds acted without just cause or willfully intended to injure the Hospital within the scope of Section 523(a)(6).  Accordingly, the McDonalds' debt to the Hospital is not excepted from the McDonalds' discharge under Section 523(a)(6) of the Bankruptcy Code.

**Conclusion**

The Court finds that the Hospital failed to prove by a preponderance of the evidence that the McDonalds' debt to the Hospital is excepted from discharge pursuant to Section 523(a)(4) or (a)(6) of the Bankruptcy Code.  Based upon the foregoing, the Court concludes that judgment should be entered in favor of the McDonalds and against the Hospital and that the McDonalds' debt to the Hospital is dischargeable in bankruptcy.  A separate judgment consistent with this Memorandum Opinion will be entered contemporaneously herewith.

**SO ORDERED** this 4th day of August, 2006.

DANA L. RASURE
UNITED STATES BANKRUPTCY JUDGE

---

[14] The McDonalds dismissed the personal injury action more than nine months after the McDonalds cashed the Blue Cross check.  The Hospital did not allege that the dismissal was wrongful or that the McDonalds dismissed the personal injury action with intent to injure the Hospital.